Marnocha v. St. Vincent Hospital. I see Mr. Cleveland and Mr. McLaughlin. All right, you may proceed, Mr. Cleveland. Thank you. Good morning. May it please the Court. Jason Cleveland for the Plaintiff Appellant Ann Marnocha, who seeks reversal of the District Court's order granting summary judgment in favor of St. Vincent on both her termination and failure to hire claims. The District Court's order compartmentalized all of the evidence in this case as opposed to viewing it as a whole. When looking at the evidence in a light most favorable to Dr. Marnocha, there's clearly a reasonable juror could find that a scheme perpetrated throughout this, that age discrimination occurred both during the termination and in terminating neonatologists. The only neonatologist that was considered retaining was the substantially younger 35-year-old Dr. Landis, and St. Vincent opined on how best to accomplish that, whether it be through a contract amendment or a termination and rehire, which it ended up being the latter. After the restructure was completed, Dr. Marnocha, age 62, had been terminated, and the much retained had continued to work for St. Vincent as a neonatologist. The District Court erred with regard to Dr. Marnocha's termination claim when it applied the wrong similarly situated standard to her case. The similarly situated analysis is not a one-size-fits-all inquiry, and this Court has gone to great lengths to develop standards that apply to the different types of cases that find its way into this Court, and that didn't apply this Court's standard that has applied to reduction-enforced cases, such as in Collier v. Budd, where work is shifted from one employee to another employee. The operative question is whether younger employees were treated more favorably, and that's exactly what happened here. Dr. Marnocha was terminated, and several substantially younger neonatologists took over her duties after the termination, including her former colleagues, Drs. White and Montgomery, as well as several other doctors who primarily worked at the 86th Street location, who were substantially younger than Dr. Marnocha. So she satisfied the similarly situated prong when she proved that she was terminated and younger, substantially younger neonatologists were not terminated and assumed her duties. This is not a disparate discipline case like the McDaniel case cited by the District Court in its order. Marnocha was not terminated for alleged poor performance, so evidence of work history, performance reviews, supervisors, or qualifications are irrelevant. Morandi is the only supervisor who matters because he's who decided who stays and who goes, and he testified that he didn't consider work performance or performance reviews in deciding to terminate the Carmel neonatologist and retain substantially younger neonatologists who were working at the 86th Street location. If I could interrupt for a minute, Mr. Cleveland, there are two different decisions here, chronologically. The first decision is Dr. Morandi's decision to basically engage in this reduction in force and reduce the number of neonatologists working at these two hospitals by terminating all of those at what I understand to be a smaller, lower-tier hospital in terms of the tiers of the NICUs, and then requiring all the neonatologists who work in the NICU at the higher-tier hospital to cover the lower-tier hospital as well, if I'm understanding the fact pattern here. So that's one decision. And then there's a separate decision to hire one more neonatologist for the NICU at the 86th Street facility who would then, like the other neonatologists at that facility, be required to cover both hospitals. And that second decision was made by committee, right? No, Your Honor. In fact, two points. So first of all, the idea that these decisions were separate from one another is built on the false premise that Dr. Morandi only ever considered terminating all of the Carmel neonatologists. And that's just simply not the case. St. Vincent considered not terminating the 35-year-old landless. And in its restructure of operations document that it produced, it cited both the 86th Street doctors and the Carmel doctors as the impacted group. So it viewed the neonatologists, they work at different locations, but these are all neonatologists that work for St. Vincent Hospital. And with regard to your second question, the evidence in a light most favorable to Marnoka, that panel did not have any authority whatsoever and did not make a decision to hire Dr. Landis. According to Dr. Rothenberg, who was on that panel and had served on 20 interview panels and interviewed numerous candidates, was an executive of St. Vincent, knows how the hiring practice worked. He testified that that wasn't their job as a panel. They weren't hiring anyone. They were there to make a recommendation and the decision on who to hire, according to Dr. Rothenberg, who's a C-suite executive, remained with Dr. Morandi. And he also testified that St. Vincent was not... He followed the committee's recommendation, right? Who did? Dr. Morandi? Right. Yes, but the situation there is, is that Dr. Rothenberg testified that St. Vincent was not tethered to the panel's recommendation. And had they not recommended Dr. Landis, or perhaps would have recommended Dr. Marnoka, they very well may have cast a wider net. So they presented a situation where they couldn't lose. They created this hiring panel, which as this court has acknowledged, can serve as a liability shield to insulate companies from liability, unless you can show that the panel was tainted by prejudice. So the panel was created as a liability shield. And if they recommended Dr. Landis and went along with St. Vincent's discriminatory intent to retain the younger Dr. Landis, then they had the cover that they they likely would have cast a wider net. They were not going to extend an offer of employment to Dr. Marnoka because of her age. As Dr. Rothenberg stated, he's on the panel. He's the chief medical officer at the 86th Street location. And he's a C-suite executive colleague. And he testified to having an age bias against Dr. Marnoka and in favor of Dr. Landis. He stated when he wrote that note at end of career, he stated that he wanted to hire Dr. Landis, who was towards the beginning of her career, as opposed to Dr. Marnoka, who was towards the end of her career. Is there any evidence that he shared that thought with anybody else on the panel? Not necessarily, Your Honor. But quite frankly, in the Hussein versus Federal Express Corporation case, that was the same situation. In fact, those, the subordinate employees, like on this panel, you've got a chief medical officer and a bunch of employees who are subordinate to him. And in that Hussein case, it was the same exact circumstances. In fact, those, the subordinate employees testified that there wasn't any undue pressure put on them to score candidates a certain way or anything along those lines. But that being said, this court recognized that the prejudice tainted the panel. And because all of those employees were subordinate to that the, had the bias, that called into question the independence of their own judgments. But wasn't Hussein different because of the person who had the bias? He's the one who actually picked the panel and had two of his subordinates on the panel. Right. But that's Dr. Morandi in this case. Dr. Morandi had the bias. That the very, when St. Vincent fired these carbon neonatologists, they didn't know that Dr. Morandi would want to reapply for the newly created neonatologist position. So when she states that she wants to reapply in the very moment, Dr. Morandi says, okay, well, let's create a liability shield. Let's create a hiring panel. And who does he put on it? But none other than several members of the small group, the so-called small group that he had been working closely with for months to carry out this restructure. And, you know, Dr. Morandi denies that that small group even existed or that he consulted with them, but clearly they did. So he stacks it with individuals that he's already been working with to see through this restructure. And then he puts on there Dr. Rothenberg, with whom, who had an admitted age bias and who he had discussed the restructure with in 2017. Even though Dr. Morandi denies those conversations happened, according to Dr. Rothenberg, they did. So he creates this hiring panel, knowing that there's a strong chance that they're going to go along with the plan that he's laid out and that he's perpetrated throughout this. So he picked the hiring panel the same way as in the Hussein case. It wasn't Dr. Rothenberg who picked the hiring panel, Dr. Morandi did. And it was Dr. Morandi and St. Vincent that had the interest in retaining the substantially younger Dr. Landis. So they create a situation where they can't lose. If, in fact, the panel goes along with what they say, then they feel like they have additional cover to carry out their discriminatory intent. If the panel doesn't recommend Dr. Landis or Dr. Landis doesn't accept the job, as Dr. Rothenberg said, and he said we because he is part of the executive committee, he is part of St. Vincent, he says we would have decided to cast a wider net. So by not utilizing the correct similarly situated standard that this court has utilized in RIF cases, the court improperly dismissed the termination case because it failed to recognize that Dr. Marnoka had satisfied the similarly situated element. And the district court also ignored Dr. Marnoka's evidence of pretext. She presented evidence calling into question the need for the RIF. And this was not a super personnel department case. Her evidence goes beyond her own personal ideas about who should have, about whether that RIF should have happened. The multiple witnesses testified that they were working a full shift prior to this. And that was a substantial change in how St. Vincent does business. It was a significant deviation from its established policy and practice, which is circumstantial evidence of discrimination. And the district court made a credibility decision in favor of St. Vincent by crediting Randy's testimony over Dr. Marnoka's testimony. And if there are any other questions, I could reserve the rest of my time for rebuttal. Excellent. Thank you. Mr. McLaughlin. Thank you, Your Honor. May it please the court, Alan McLaughlin, on behalf of Defendant Appalee St. Vincent Healthcare and St. Vincent Carmel Hospital. This case does not present any unique question of law nor any need to challenge well followed and did not depart in any way from this court's precedent in ruling that there exists no record evidence that age was a factor in either decision. And as Judge Sykes correctly points out, there were two entirely separate decisions. First, the decision that to terminate all neonatologists at the Carmel Hospital, including a physician who was not a member of the protected class. And the second decision, entirely separate with an entirely separate process, entirely different set of decision makers, that a six member physician panel, not including Dr. Morandi, which unanimously decided to hire a neonatologist, the panel determined was more qualified than Dr. Marnoka and other applicants. Now, to break those decisions down, we separate them out as is appropriate. First and foremost, the termination decision. We highlight three overarching dispositive factors. First of all, Dr. Morandi terminated an entire department at a separate and different level facility, not just an individual and not just Dr. Marnoka. There were five Carmel neonatologists. Now, everyone agrees, there's no dispute in this case that they are all Thus, there can be no evidence that Dr. Marnoka was treated any less favorably than any other Carmel neonatologist, including the 35-year-old who was also terminated. Indeed, Dr. Morandi testified, and it's unconverted, that he did not know the ages or the qualifications of the Carmel neonatologists, other than that they were working at a lesser facility, a level three facility, as opposed to those neonatologists who were at the 86th Street facility, who were at a higher level, a level four facility. Likewise, there is no dispute that Dr. Morandi retained all 22 neonatologists at the 86th Street facility. That included three neonatologists who were older than Dr. Marnoka. It included 12 neonatologists who were in the protected age group. So there is simply no evidence that age was a factor in any aspect of that decision to terminate all Carmel neonatologists. Now, the second aspect of that termination decision is that the district court correctly determined that the 86th Street neonatologists are not similarly situated in all material respects, so as to be proper comparators. And we have distinguished the Collier case, and we take great issue with counsel's interpretation of Collier. All Collier had done was to say the district court in that case had incorrectly said that if the plaintiff cannot show that there is a younger employee who took the position of the terminated employee, then they cannot carry their burden, and they lose on that age case. The court didn't do away with the similarly situated argument or change that standard in any way, and thus the district court correctly applied that standard in this case. It looked at were they the same supervisor, and they were not. In fact, Dr. Marnoka herself testified that she was the medical director and supervisor at Carmel. She was not the supervisor for anyone at 86th Street. Conversely, Dr. Taha Bin Saad was the medical director and supervisor of 86th Street neonatologists. He was not the supervisor of 86th Street neonatologists. He was the medical director and supervisor of 86th Street neonatologists. The most critical distinction, though, is that they simply are not performing and judged by the same standards and qualifications. The critical distinction is that 86th Street is a level 4 facility rather than a level 3 facility. You have additional requirements, additional experiences, additional talents, additional requirements to treat more critically ill infant patients at that level 4 facility. So when Dr. Morandi is looking at how to staff and realizing there's an overstaffing issue, he can take those neonatologists and know that they already are performing those functions, and they could perform at a lesser facility. The reverse is not true, and that was the end of the analysis. That was the end of any analysis required. But to dig deeper, to show that they were not similarly situated, 86th Street provided care and treatment for a much larger census of critically ill infants. At any one time, Carmel had perhaps 6 to 8 critically ill infants. 86th Street had 60 to 70 critically ill infants. Only 2% of the infants at the Carmel facility ever even qualified for level 3 care. 98% didn't make it that far. They were at level 1 or level 2. So these are neonatologists. While they all are neonatologists, that's understood. They are simply not performing the same functions. They are not having the same supervisors. They are not addressing the same volume and pace of practice. Ultimately, those neonatologists who were at 86th Street had the current experience of performing at a level 4 facility, and those at Carmel did not. And on that basis, they could not be considered similarly situated for comparative purposes. But finally, as this court pointed out in both the Skiba and the McDaniel cases, even if we assume that it would be appropriate to consider the 86th Street neonatologists as similarly situated in all material respects, and they were not, even then, Dr. Marnoka failed to provide the district court with any record evidence on which to make any reasonable assessment as to how we compare these. Were they, in fact, similarly situated? She provided no evidence that they had the same supervisor other than two levels up. She presented only the names and ages of 86th Street employees. There's no evidence of the same standards or qualifications, as we've pointed out already, the difference in level 3 and level 4. Along with the only evidence Dr. Marnoka presented was her own personal assessment in which she said, and I quote, I have way more experience at doing things than a number of names, didn't provide any different skill sets, didn't provide any different experiences on which this court or the district court could assess whether they are similarly situated. In fact, as we previously noted, of those 86th Street neonatologists, three of them were older than Dr. Marnoka, five were within 10 years of her age, and four more were above the age of 40. So over half the people at 86th Street were in the protected age group. There is simply Dr. Marnoka failed to provide any evidence on which this court or the district court could assess whether they were similarly situated, even if it was appropriate to do so. And we've cited Skiba and Collier for that distinction. So on that basis, there simply is no record evidence to was based on age, and there can be no such evidence. We take great issue with counsel's reference that Dr. Landis was given preferential treatment. That the evidence in the record is quite clear that that was Ms. Harris who had performed an analysis after the decision to terminate all caramel neonatologists was made. She made her own assessment. She clarified in the record that Dr. Morandi had not discussed that, that it was not his opinion, that it was her opinion, and it wasn't based on his analysis and had no impact on his analysis. And she's in HR. She's in HR. Correct. And just as a matter of course, anytime there's a reduction in force, she does some kind of independent analysis that they were similarly situated. She simply used everybody with that title. And again, that was done after Dr. Morandi had made his independent decision, and there is no evidence in the record to suggest in any way that that was not his independent decision. So then we shift gears to the decision not to hire or rehire Dr. Marnok. And counsel conveniently suggests that anytime a defendant employer would create an independent panel, they're doing it as a subterfuge. And that simply can't be the case. Certainly you can recognize that as a possibility if there is any evidence in the record. And here there is not. Dr. Morandi had no involvement in that panel decision as to who to hire. All caramel neonatologists were and challenging of counsel's assessment that this was just a cover-up. Not only did they notify Dr. Marnok of who would be on that panel, but then they allowed Dr. Marnok on the spot to suggest that one of the panel members might not be fair to her. That was Dr. John Wareham. And so they removed him from the panel. And indeed, they allowed Dr. Marnok to suggest who might be favorable to her or who she would suggest having on the panel. And she suggested Dr. Ina Whitman, and they placed her on the panel. Was it Dr. Morandi's ultimate decision as to who should be on that panel? I don't think the record reflects that, but I believe that would be a fair interpretation. But that's why it is so critical to acknowledge, Your Honor, that he went to Dr. Morandi to add another person. More appropriately, it was six panel members, all physicians, not all neonatologists. Quite notably, Dr. Rothenberg was not a neonatologist, didn't work at the same facility as all these other persons, and there's nothing in the record to reflect that he had any influence over anyone else. There were six panel members, including Dr. Whitman, who Dr. Marnok put on the panel, and they all agreed that Dr. Landis was the most qualified. None of those panel members had had any involvement whatsoever in Dr. Marnok's termination or the termination of the Carmel neonatologist. The record is also uncontroverted that they had interview forms with eight categories. They followed all those categories, and they identified the decision, the reason for their decisions. They highlighted recent Level 4 NICU experience, a top-ranked NICU, that Dr. Landis already had developed and presented a plan to transition to Level 4 86th Street facility. She already had begun research on surgical protocols in Level 4 NICUs, and she had a positive attitude. The panel then compared that to Dr. Marnok. Dr. Marnok's last Level 4 experience was 15 years ago. Dr. Marnok testified to this panel or expressed to this panel that, quote, not much had changed in those 15 years. And the panel, in their testimony, deposition testimony, said they respectfully disagreed with that, that a lot had changed. And while Dr. Marnok felt that it wouldn't take her much to get up to speed, the panel felt it would take her a great deal of time to get up to speed. Mr. McLaughlin, why wouldn't Dr. Rothenberg's written comment about the plaintiff being at the end of her career create at least an issue of fact as to whether or not the panel itself was biased? First of all, Your Honor, it was a unanimous decision. Secondly, there's no evidence that Dr. Rothenberg had any influence over the panel. It was a unanimous decision. So even if you assumed that he had some bias, which we would contend is a false assumption, and there's no record of that, that that wouldn't have impacted the panel's decision in any way. The uncontroverted testimony is that age was never discussed, and age was not a factor in that as Your Honor points out from the Hussein decision, where the very decision maker put himself on the panel, picked the panel with his two direct subordinates, and he controlled the panel. There is no evidence, absolutely no record evidence, that Dr. Rothenberg had any influence over anybody else, that age was ever discussed. And indeed, quite frankly, all he said was at the if this individual had been at the end of the career and had said, and was only 20 years old, it would have made a difference. That's not reflected in those comments. And most importantly, those comments were never conveyed to anyone else on the panel or influenced them in any way. Unless the Court has other questions, I see my time has expired. All right. Thank you very much. Mr. Cleveland. Thank you. Your Honor, at the same time that St. Vincent was claiming it had too many neonatologists and was terminating older neonatologists, it was bringing on brand new, substantially younger neonatologists. Dr. Hillary White, age 37, started working for St. Vincent in August 2017, after St. Vincent claims it determined it had too many neonatologists. And Dr. Kelsey Montgomery, age 36, started working for St. Vincent in 2018, shortly after the restructure happened. So in June 2017, St. Vincent says, we've got too many neonatologists. Then they bring on another one, a brand new, substantially younger neonatologist. Then they fire four older neonatologists, and then turn around and hire another one. Numbers matter on this case, Your Honor. Dr. Morandi stated, I've got 27 and I only need 23. At the end of the day, they were only down two. So they fired four older doctors to get down by two neonatologists. So the net numbers matter in this case. And to point to something that- Mr. Cleveland, they fired all five and invited them all to reapply to the 86th Street. Right, but they considered retaining Landis. If there was nothing in the record about- That was the HR director's independent assertion of Landis as a possible rehire, that Dr. Morandi didn't- I respect that motivation. And what we're concerned about here is motivations, right? I respectfully disagree because Kelly Harris testified that she didn't know what anybody's level four experience was, that she got that information from Dr. Morandi. Dr. Morandi claims that he didn't know that information. So there's disputed testimony there. And Kelly Harris states, first of all, she states, I don't remember who had the preference. And then she said, well, I think I did have a preference. She talked about the contract issue, but not about the level four. And all of the level four discussion, according to Kelly Harris, came from Dr. Morandi, which he denies he even considered. And so I think in a light most favorable to Dr. Marnoka, that St. Vincent can't be taken for its word on that because there's- But you can't accept your characterization of the hospital system firing four because that's just not factual. What's factual is that the hospital system fired all five at Carmel and invited them to reapply to the one open position at 86th Street. And then there was a separate process for that. But in the preference for Landis, they opined whether to just do an amendment to her contract or to do a termination and rehire. So yeah, factually, they did terminate her and they contemplated doing that as a way to keep her on. Should we adjust her contract or should we terminate her and then rehire her? And so while factually, yes, they did terminate and rehire her, they called their shot on that. They said, this is what we're going to do. And that's, in fact, what happened. And as to Harris's document, it didn't just include neonatologists. It included hospitalists too. So to the defense's standpoint that it just included everybody with the same title, well, that's simply not true. They included hospitalists in that number too, which skewed the statistics. And I see that my time is up. Thank you very much. We'll take the case under advisement.